IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY _____ D.C.

05 OCT 12 AM 10: 57

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

JIMMYRICO PIGRAM, by and through his
next friend (mother), LINDA PIGRAM, and
LINDA PIGRAM,

        Plaintiffs,

v.                                                                No. 04-2282 B

OFFICER R. CHAUDOIN, and other individually
unnamed officers with the MEMPHIS POLICE
DEPARTMENT,

        Defendants.

---

ORDER GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT OF DEFENDANT CHAUDOIN,
AND DISMISSING STATE CLAIMS

---

INTRODUCTION

This lawsuit has been brought by the Plaintiffs, Jimmyrico Pigram, by and through his next

friend (mother), Linda Pigram, and Linda Pigram (collectively, "Pigram"), against the Defendant,

Officer R. Chaudoin,[1] alleging violation of Jimmyrico Pigram's civil rights, and state law causes of

---

[1]Suit was also originally brought against the Memphis, Tennessee City Schools, the City of Memphis and "other individually unnamed officers with the Memphis Police Department. In an order entered November 23, 2004, this Court granted the motion to dismiss of the Defendant City of Memphis. Further, an order of dismissal was entered on April 20, 2005 as to the Defendant Memphis City Schools. With respect to the "other individually unnamed officers with the Memphis Police Department, an action cannot be commenced against parties until they are identified and served. See Bufalino v. Michigan Bell Tel. Co., 404 F.2d 1023, 1028 (6th Cir. 1968), cert. denied, 394 U.S. 987, 89 S.Ct. 1468, 22 L.Ed.2d 763 (1969); see also Cox v. Treadway, 75 F.3d 230, 240 (6th Cir.), cert. denied, 519 U.S. 821, 117 S.Ct. 78, 136 L.Ed.2d 37 (1996) (citing Bufalino). As neither has occurred, the Plaintiffs' claims against these individuals are hereby DISMISSED. Thus, Defendant Chaudoin is the only remaining Defendant in this matter.

action for assault and outrageous conduct. The Defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

STANDARD OF REVIEW

The Rule states in pertinent part that a

> . . . judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir. 1988).

In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S.Ct. at 2553. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S.Ct. at 1356. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The "judge may not make credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

## UNDISPUTED FACTS

The following facts are undisputed.  On April 22, 2003, Jimmyrico Pigram was a student a Westside High School in Memphis, Tennessee.  After he created a disturbance in the classroom, his teacher sought the assistance of Officer Marcus Frierson, a Memphis police officer assigned to the Westside campus.  Officer Frierson handcuffed the Plaintiff and took him outside, planning to request the assistance of another officer.  Before he could do so, however, he spotted a squad car driving by the school and flagged it down.  The passing officer, identified as Defendant Chaudoin, placed Pigram in the back of his squad car and, during that process, it is undisputed that Pigram offered some resistance.  The Plaintiff was transported to a juvenile court facility.  Jimmyrico Pigram and his mother have alleged in this action that Chaudoin used excessive force in effecting the arrest by slapping the Plaintiff, handcuffing him too tightly, spraying mace in his face and restraining him with a "rip hobble."

## ANALYSIS OF THE PARTIES' CLAIMS

A.    42 U.S.C. § 1983.

     I.    Generally.

Although the Plaintiffs do not identify in their complaint the basis for their civil rights claim, complaints of the use of excessive force are governed by 42 U.S.C. § 1983, which imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983.  In order to prevail on such a claim, a § 1983 plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." Wittstock v. Mark A. Van Sile,

Inc., 330 F.3d 899, 902 (6th Cir. 2003). "Section 1983 is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred." Humes v. Gilless, 154 F.Supp.2d 1353, 1357 (W.D. Tenn. 2001).

II.    Qualified Immunity.

As a defense to a § 1983 action, an individual defendant may, and Chaudoin has in fact done so here, argue that he is entitled to qualified immunity. "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 1696, 143 L.Ed.2d 818 (1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); see also Buckner v. Kilgore, 36 F.3d 536, 539 (6th Cir. 1994), reh'g and suggestion for reh'g en banc denied (Nov. 21, 1994). This Circuit conducts a three-step inquiry with respect to qualified immunity claims.

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

Feathers v. Aey, 319 F.3d 843, 848 (6th Cir. 2003), reh'g and reh'g en banc denied (May 6, 2003) (internal quotation marks omitted).

Therefore,

> [q]ualified immunity shields an officer from suit when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted. Because the focus is on whether the officer had fair

4

> notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

Brosseau v. Haugen, 543 U.S. 194, ___, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (internal citations omitted).

III.    Excessive Force Claims under the Fourth Amendment.

The constitutional right[2] implicated in an excessive force case is that guaranteed pursuant to the Fourth Amendment,[3] in which the Plaintiffs must show that the Defendant's actions were, under the circumstances, objectively unreasonable. See Scott v. Clay County, Tenn., 205 F.3d 867, 876 (6th Cir.), cert. denied, 531 U.S. 874, 121 S.Ct. 179, 148 L.Ed.2d 123 (2000).

In defining the boundaries of Fourth Amendment reasonableness, the Supreme Court has stated as follows:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake . . . . Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. . .

---

[2]There is no dispute that the second element of the § 1983 claim, whether Chaudoin was a state actor, has been satisfied. Thus, the Court focuses its attention only to the constitutional claim.

[3]The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. These protections apply equally to civil and criminal cases. Daughenbaugh v. City of Tiffin, 150 F.3d 594, 598 (6th Cir. 1998).

. . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies:  Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one:  the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them . . .

Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1871-72, 104 L.Ed.2d 443 (1989)

(internal citations and quotations omitted).

B.     Application of the Law to this Case.

With the foregoing principles in mind, the Court will address each of the alleged uses of excessive force seriatim.

I.      The Slap.

The Plaintiffs have alleged, and testified in their depositions, that Chaudoin slapped Jimmyrico Pigram in the face.  While the Defendant disputes the allegation, he argues that, even if the slap occurred, it did not constitute a violation of a clearly established constitutional right.  At the point the alleged slap took place, Chaudoin recalled as follows.

As Officer Frierson started to put Mr. Pigram in the rear seat of my squad car, Mr. Pigram began "bucking" and resisting Officer Frierson's attempts to place him in the car.

When Mr. Pigram began to resist, I exited the squad car, and went around to the passenger side of the car to assist Officer Frierson in gaining control of Mr. Pigram. At this time, Mr. Pigram was cursing and resisting our efforts to place him in the squad car.

Once we safely restrained Mr. Pigram, I removed Officer Frierson's handcuffs, and

6

I placed my handcuffs on Mr. Pigram. . . .

(Exs. in Supp. of Summ. J. by Def., Officer Russell Chaudoin, Ex. 2 (Aff. of Officer Russell Chaudoin ("Chaudoin Aff.") at ¶¶ 6-8.)

In support of his position that a finding of qualified immunity is appropriate, the Defendant refers the Court to the Sixth Circuit's unpublished opinion in Lyons v. City of Xenia, 90 F.App'x 835 (6th Cir. 2004). In Lyons, the plaintiff testified that she was arguing with one female officer when another officer, Matthew Foubert, charged and tackled her, knocking her to the floor and handcuffing her. Lyons, 90 F.App'x at 837-38. Telling a different version of events, Foubert stated that, when he appeared on the scene, the two women were struggling with each other on the floor side by side. He pulled the plaintiff, who had already been handcuffed on one hand, away from the female officer by picking her up and leaning her over a chair using a balance displacement technique. Id. at 838-39. The court, in a majority opinion authored by Circuit Judge Julia Smith Gibbons, concluded that summary judgment on the qualified immunity issue was not appropriate, as a determination as to whether Foubert's action violated clearly established law turned on whom the trier of fact believed. Id. at 848-849. On appeal of the Sixth Circuit's decision as to the tackling claim, the Supreme Court vacated the circuit court's finding and remanded the case in light of its decision the same day in Brosseau. See Foubert v. Lyons, ___ U.S. ___, 125 S.Ct. 808, 160 L.Ed.2d 596, 72 U.S.L.W. 3750 (No. 03-1622) (U.S. Dec. 13, 2004).

In an opinion entered after the parties herein had submitted their briefs, the Sixth Circuit, after "considering the Supreme Court's treatment of similar qualified-immunity issues in Brosseau," reversed its earlier stance and "extend[ed] qualified immunity to Officer Foubert for Lyons' excessive-force tackling claim." Lyons v. City of Xenia, 417 F.3d 565, 569 (6th Cir. 2005) (Lyons

7

II). In doing so, the court noted that

> Brosseau leaves open two paths for showing that officers were on notice that they were violating a "clearly established" constitutional right--where the violation was sufficiently "obvious" under the general standards of constitutional care that the plaintiff need not show "a body" of "material similar" case law, and where the violation is shown by the failure to adhere to a "particularized" body of precedent that "squarely govern[s] the case here."

Lyons II, 417 F.3d at 579 (internal citations omitted).  Applying this standard, the Sixth Circuit determined first that there was nothing "obvious" about what Foubert should have done under the circumstances he faced.  Second, "no precedent 'squarely govern[ed] the case.'"  Id. (citing Brosseau, 125 S.Ct. at 600).  The court recognized that

> [a]s the cases that we have canvassed fairly indicate, the standards governing the constitutionality of [the plaintiff's] excessive-force claim depend very much on the facts of each case.  To that end, we have been unable to identify a single case predating the conduct at issue that prohibits tackling in a materially similar context.  Because the focus is on whether the officer had fair notice that her conduct was unlawful, and because Officer Foubert's actions, as in Brosseau, at best fell in the hazy border between excessive and acceptable force, [the plaintiff] has failed to show the violation of a clearly established right in this more "particularized" sense.

Id. at 579 (internal citations and quotation marks omitted).

Jimmyrico Pigram has offered testimony in this case that, when Officer Frierson escorted him out of the school building,

> this man [Chaudoin] came up in another police car and he said he was just cruising through, did he [Frierson] need any help.  Anyway, he asked me my name, I told him, he didn't understand it, so I got smart with him.  Then he got out of the car and came running and said something, and I said "F--- you," and then he slapped me, and turned me around and put me on the car.

(Exs. in Supp. of Summ. J. by Def., Officer Russell Chaudoin, Ex. 5 (Dep. of Jimmyrico Pigram ("J. Pigram Dep." at 17).  At that point, according to the Plaintiff, Chaudoin removed Frierson's handcuffs and replaced them with his own.  (J. Pigram Dep. at 17).  Similarly, in a complainant

8

statement given to the Memphis Police Department's internal affairs bureau ("IAB"), Jimmyrico

Pigram averred that

> I was escorted in front of the school a police car came up. And then Officer Frierson said he was calling for somebody else. The officer asked my name and I told him Jimmyrico and he asked me was I getting smart with him and I said yes. So he got out of the car and walked around to my side and he said say something else and I said fuck you. Then he hit me on the side of my face.

(Exs. in Supp. of Summ. J. by Def., Officer Russell Chaudoin, Ex. 6 (Complainant Stmt. (Jimmyrico

Pigram) ("Statement of J. Pigram") at 2).

> Linda Pigram testified in her deposition as follows:

> I drove up, my son was standing up, and the one City School police officer, the one coming from the school, he was standing outside with my son. Then as I got out of the car, and I seen another police officer got out of his -- this is the second car, he got out of his car, and I don't know what words was said, you know, I was like -- I don't know what was going on. But I seen the officer slap my son, and that's when I got upset, and I went to him, and he was like, well, who are you. Well, I had first asked, I was like, why did you slap my son. He said, who is you. I said, I'm his mother. He said, your son has got a smart-ass mouth.

(Exs. in Supp. of Summ. J. by Def., Officer Russell Chaudoin, Ex. 7 (Dep. of Linda Pigram ("L.

Pigram Dep." at 12). She recalled asking Chaudoin more than once why he had slapped her son,

stating that "I know he's got a bad mouth, but you didn't have to slap him while he's handcuffed, he

wasn't fighting you or anything." (L. Pigram Dep. at 14). According to Ms. Pigram, the last time

she asked him about the slap, Chaudoin replied, "you're lucky I didn't do more than that." (L. Pigram

Dep. at 42). She gave the same account to the IAB officer. (Exs. in Supp. of Summ. J. by Def.,

Officer Russell Chaudoin, Ex. 8 (Complainant Stmt. (Linda Pigram) ("Statement of L. Pigram") at

2-3).

Viewing the evidence, as it must, in the light most favorable to the Plaintiffs, the finder of

fact could conclude that Chaudoin slapped Pigram while he was handcuffed, and that the slap constituted a violation of a constitutional right. As it should be "obvious" that a handcuffed juvenile has a right to not be struck in the face by a police officer not because he is an immediate threat but because he has a "smart-ass mouth," a finding for summary judgment on the grounds of qualified immunity as to the alleged slap is not warranted.

II.   Tight Handcuffs.

The Sixth Circuit also observed in Lyons II that "[t]he Fourth Amendment . . . prohibits unduly tight handcuffing in the course of an arrest." Lyons II, 417 F.3d at 575. "[T]his general principle" is "clearly established" for qualified immunity purposes. Id. The court went on to caution, however, that "[n]ot all allegations of tight handcuffing . . . amount to excessive force. In order to reach a jury on this claim, the plaintiff must allege some physical injury from the handcuffing and must show that officers ignored [his] complaints that the handcuffs were too tight." Id. at 575-76 (internal citations omitted). As was the case with the alleged slap, the existence of a genuine issue of material fact precludes summary judgment.

The Defendant points to his own affidavit, as well as those of Officer Frierson and Jeanne Thompson, a probation counselor at the Shelby County Juvenile Court who interviewed Jimmyrico Pigram upon his arrival at the juvenile facility and, later, his mother. All three affiants denied knowledge of any tight handcuffing, complaints from Jimmyrico that the cuffs were uncomfortable, or injuries consistent with tight handcuffs. See Chaudoin Aff. at ¶¶ 8-9; (Exs. in Supp. of Summ. J. by Def., Officer Russell Chaudoin, Ex. 3 (Aff. of Marcus Frierson ("Frierson Aff.") at ¶ 17); (Exs. in Supp. of Summ. J. by Def., Officer Russell Chaudoin, Ex. 4 (Aff. of Jeanne Thompson

10

("Thompson Aff.") at ¶¶ 2-3, 5, 7, 10-11).

However, Jimmyrico Pigram testified that, after he arrived at the juvenile detention facility, he "told [the guards] that [his] wrists were swelling and [he] need[ed] to go on the south side and lay down." (J. Pigram Dep. at 32.)  He further offered the following testimony:

Q:      Did you show the guards your wrists?

A:      No, sir.

Q:      You didn't show them your wrists where they were swollen?

A:      No, sir.

Q:      How long did the swelling last?

A:      About two or three hours.

Q:      Two or three hours.  When did you notice that the cuffs were too tight?

A:      When [Chaudoin] first put them on.

Q:      Did he ask you anything about the cuffs?

A:      No, sir.

Q:      Did you say anything to him about the cuffs?

A:      I think I tried to, but he wouldn't listen.

Q:      Do you remember when you tried to say -- I mean, when was it that you tried to say something to him?

A:      I don't remember.

Q:      So, you didn't receive any medical treatment regarding your wrists?

A:      Yes, sir.

*      *      *

> Q:      . . . Now, you said you didn't receive any medical treatment.  Are you aware
>         of anybody making any note about your wrists . . .?
>
> A:      No, sir.
>
> Q:      Are you aware of anybody taking any pictures of your wrists . . . ?
>
> A:      I don't remember.

(J. Pigram Dep. at 33-34, 36.)  In his IAB complaint, Pigram stated that his right wrist was swollen because the Defendant put the handcuffs on too tightly and that he failed to inform the officer of his discomfort because "he wouldn't listen." (Statement of J. Pigram at 4.) Linda Pigram recalled telling Chaudoin concerning the handcuffs that he was "doing them mighty tight," but he ignored her.  (L. Pigram Dep. at 13.) Ms. Pigram reported in her IAB complaint that during her visit to her son at the juvenile facility she noticed that his right wrist was "swollen and puffed up from the handcuffs." (Statement of L. Pigram at 4.)  Accordingly, the Plaintiffs have presented evidence that, if believed, could lead the finder of fact to reasonably determine that some physical injury resulted from the handcuffing and that the Defendant ignored Pigram's complaints that the handcuffs were too tight. See Lyons II, 417 F.3d at 575-76.

III.      Use of Chemical Agent.

The facts surrounding the use of a chemical agent by Chaudoin are essentially undisputed. The Plaintiff entered the back of the cruiser, handcuffed, of his own volition.  The door was closed. Jimmyrico Pigram described what happened next as follows:

> A:      Then I started banging my head on the window.
>
> Q:      Now, which window?
>
> A:      The window separating the front seat from the back.

Q:   So, that plexiglas [sic] dividing partition between the front seat of the police car and the back seat of the police car, you started banging your head on that partition?

A:   Yes, sir.

                    *        *        *

Q:   So, you're banging your head on the partition between the seats.  What happens next?

A:   I started banging on the window and kicking my feet.

Q:   When you say, "banging on the window," still that same window or another window?

A:   No, the door window.

Q:   The rear car door window of the police car?

A:   On the right side.

Q:   On the right side.  So, you started banging that and started kicking with your feet.  What happened next?

A:   Then he opened the door and said, if you kick or do something else, he's going to spray me.

Q:   When you said "he," is that Officer Chaudoin?

A:   Yes, sir.

Q:   Okay.  So, he told you that if you kick or do something else, he's going to spray you?

A:   Yes, sir.

Q:   What happened next?

A:   He closed the door, I did it again, he opened the door and he started shaking the bottle.  I turned my head, and he said, you're not so dumb, he said some statement.  Then after I turned my head again, he sprayed me.

(J. Pigram Dep. at 24-26.) Chaudoin averred in his affidavit that, prior to his threat to spray Pigram, the Plaintiff kicked him in the upper chest, an allegation denied by the Plaintiff. (See Chaudoin Aff. at ¶¶ 11-12.)

Even though the severity of the offense was slight, based on the undisputed facts, at the time he was sprayed with the chemical agent, Pigram was clearly resisting and, in kicking at the glass windows of the cruiser and banging his head against its hard interior surfaces, was also a danger to himself and anyone venturing near him. Moreover, he was warned that continued violent behavior would result in a chemical spray. The Court finds that a reasonable officer in Chaudoin's position would not necessarily have known it might be unlawful for him to use an agent on an individual who was resisting arrest under the circumstances at hand. See Graham, 490 U.S. at 396-97, 109 S.Ct. at 1871-72; Greene v. Barber, 310 F.3d 889, 898-99 (6th Cir. 2002) (qualified immunity proper where defendant officer used chemical agent to subdue plaintiff being arrested for a low-level disturbance, and who was not threatening anyone's safety or attempting to escape but who was admittedly actively resisting arrest); see also Shreve v. Jessamine County Fiscal Ct., No. Civ.A. 04-292-KSF, 2005 WL 1657085, at *4 (E.D. Ky. July 14, 2005) (pepper spray not excessive force where officers attempted to convince the plaintiff to surrender several times, warned her they would spray into the closet if she did not come out, and then did so indirectly when she refused to comply).

The Plaintiffs' extensive citation to Champion v. Outlook Nashville, Inc., 380 F.3d 893 (6th Cir. 2004), cert. denied sub nom. Dickhaus v. Champion, ___ U.S. ___, 125 S.Ct. 1837, 161 L.Ed.2d 725, 73 U.S.L.W. 3466 (No. 04-1050) (U.S. Apr. 18, 2005), does not sway the Court from its conclusion. In Champion, the court determined that it was clearly established that the continued use

14

of pepper spray on the plaintiff, whom the officer knew to be mentally ill or retarded,[4] after he was handcuffed and hobbled, was struggling to breathe, and had vomited several times, constituted excessive force. <u>Champion</u>, 380 F.3d at 903. Obviously, the alleged force in this case falls far short of that present in <u>Champion</u>.

IV.    The Rip Hobble.

Even though the Defendant addresses the issue of the rip hobble in his dispositive motion, the Plaintiffs make no mention of it in their response, stating in the final paragraph thereof that "[p]laintiff had a clearly established right to be free from excessive force, and the hit while handcuffed, the handcuffs placed too tightly, and the pepper spraying while handcuffed in the back of the police car, individually and collectively, constitutes excessive force . . ." As it appears to the Court that the Plaintiffs have abandoned this claim, it is dismissed.

STATE LAW CLAIMS

The Plaintiffs' claims under Tennessee law are governed by the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn.Code Ann. 29-20-201 <u>et seq.</u> The § 1983 claims would ordinarily confer supplemental jurisdiction over the TGTLA claims because they arise out of the

---

[4]The Plaintiffs attempt to draw a parallel between Jimmyrico Pigram and the plaintiff in <u>Champion</u>, who was autistic, completely unable to care for himself, unresponsive and unable to speak. <u>See</u> <u>Champion</u>, 380 F.3d at 896. The officer was aware that Champion was mentally ill. <u>Id.</u> Linda Pigram stated in her deposition that her son, who attended special education classes because of a learning disability, had occasional outbursts and that he took medication to control his behavior. She averred that he did not always take his medication and that at the time the incident occurred the dosage may not have been properly regulated. In her IAB complaint, Ms. Pigram stated that "I had mentioned to them over and over that he acts like this when he doesn't take his medication." (Statement of L. Pigram at 4.) It is unclear from the evidence presented exactly to whom the reference to "them" is directed. In any case, unlike Champion, Jimmyrico Pigram was undisputedly responsive and there is not a clear indication that Chaudoin was aware he had any type of disability or that he took medication.

same facts and form part of the same case or controversy. See 28 U.S.C. § 1367(a).  However, TGTLA claims must be brought in "strict compliance" with the terms of the statute.  Tenn. Code Ann. § 29-20-201(c).  The TGTLA gives the state circuit courts exclusive original jurisdiction over claims brought pursuant to its provisions.  Tenn. Code Ann. § 29-20-307.

A federal district court may, in its discretion, decline supplemental jurisdiction over a state law claim, even if jurisdiction would otherwise be proper under 28 U.S.C. § 1367(a).  Section 1367(c)(4) allows a district court to "decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."

In Gregory v. Shelby County, Tennessee, 220 F.3d 433 (6th Cir. 2000), the Sixth Circuit affirmed the district court's dismissal of the TGTLA claims, stating, "[i]n this instance, the Tennessee legislature expressed a clear preference that TGTLA claims be handled by its own state courts.  This unequivocal preference of the Tennessee legislature is an exceptional circumstance for declining jurisdiction."  Gregory, 220 F.3d at 446; see also Maxwell v. Conn, No. 89-5060, 1990 WL 2774 (6th Cir. Jan.18, 1990) (TGTLA's grant of exclusive jurisdiction to the state courts "belied" plaintiff's argument that he could expect to try the TGTLA claims in the same proceeding as his federal claims); Spurlock v. Whitley, 971 F.Supp. 1166, 1185 (M.D. Tenn. 1997).

Furthermore, in Beddingfield v. City of Pulaski, 666 F.Supp. 1064 (M.D. Tenn. 1987), rev'd on other grounds, 861 F.2d 968 (6th Cir.1988), the court held that the TGTLA's exclusive grant of jurisdiction to the state circuit courts precluded the federal court's exercise of supplemental jurisdiction over TGTLA claims.  The court reasoned that, when such supplemental state law claims involve neither federal law nor federal diversity jurisdiction, no Supremacy Clause interests are

16

implicated.  Therefore, federal courts would appear obligated to apply the TGTLA limitations on suability as a matter of state substantive law.  See Fromuth v. Metropolitan Gov't of Nashville, 158 F.Supp.2d 787, 798 (M.D.Tenn.2001).  The Court declines to accept jurisdiction over the Plaintiffs' claims brought pursuant to Tennessee law in accordance with 28 U.S.C. § 1367(c)(4).

CONCLUSION

For the reasons articulated herein, the motion of the Defendant for summary judgment is GRANTED on the grounds of qualified immunity as to the Plaintiffs' allegations concerning the use of pepper spray; GRANTED as to use of the rip hobble; and DENIED as to the remaining § 1983 claims.  The Plaintiffs' state law claims are DISMISSED in their entirety.

IT IS SO ORDERED this 12th day of October, 2005.

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 41 in case 2:04-CV-02282 was distributed by fax, mail, or direct printing on October 12, 2005 to the parties listed.

---

Henry L. Klein
APPERSON CRUMP & MAXWELL, PLC
6000 Poplar Ave.
Ste. 400
Memphis, TN 38119--397

William T. Winchester
THE LAW OFFICES OF WILLIAM T. WINCHESTER
2600 Poplar Ave.
Ste. 507
Memphis, TN 38112

Timothy P. Taylor
GODWIN MORRIS LAURENZI & BLOOMFIELD, P.C.
50 N. Front St.
Ste. 800
Memphis, TN 38103

Michael R. Marshall
STOKES BARTHOLOMEW EVANS & PETREE, P.A.
1000 Ridgeway Loop Rd.
Ste. 200
Memphis, TN 38120

Honorable J. Breen
US DISTRICT COURT